[Cite as *State v. Wilson*, 2022-Ohio-504.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    CASE NO. 1-20-46

v.

ERIC D. WILSON, JR.,

    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2019 0262

**Judgment Affirmed**

Date of Decision:  February 22, 2022

APPEARANCES:

    *Markus L. Moll* for Appellant

    *Jana E. Emerick* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Eric D. Wilson, Jr. ("Wilson") appeals the judgment of the Allen County Court of Common Pleas, alleging (1) that his convictions are not supported by sufficient evidence; (2) that his convictions are against the manifest weight of the evidence; (3) that he was denied his right to the effective assistance of counsel; (4) that the trial court improperly allowed a witness to testify as an expert; (5) that the trial court erred in granting a witness immunity; (6) that the trial court erred in admitting an expert report; and (7) that the trial court erred in imposing his sentence. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} On June 14, 2019, Detective Callie Basinger ("Detective Basinger") of the Allen County Sheriff's Office received a report of a shooting on Lark Avenue in Lima, Ohio. Tr. 182. Detective Basinger went to the scene where she observed the victim of the shooting lying face down near the property line between two residences. Tr. 183, 190. Ex. 4-5. She approached the victim and determined that he was deceased. Tr. 183. The victim was later identified as Christian Laws ("Laws"), who was also known by the nickname "Mad Maxx." Tr. 183.

{¶3} A neighbor informed the police that he followed two individuals involved in the shooting to an address on St. Clair where a Willie Banks, Sr. ("Willie Sr.") and Lakendra Blackman ("Lakendra") lived. Tr. 188, 190-191. The police

went to the house at this address and discovered a number of people at the residence besides Willie Sr. and Lakendra. Tr. 190-193. Several of the individuals who were at the residence were placed into police cruisers and brought to the police station for interviews regarding Laws's death, including Willie Banks, Jr. ("Willie Jr."); Dontez Smith ("Smith"); and Jolade Omosikeji ("Omosikeji"). Tr. 192-194. In an interview with Detective Steven J. Stechschulte ("Detective Stechschulte"), Omosikeji confessed to having shot and killed Laws. Tr. 197. The police learned that Smith was with Omosikeji at the time that Laws was shot. Tr. 686.

{¶4} Patrolman Sam Crish ("Patrolman Crish") was a part of the initial investigation into the shooting of Laws. Tr. 359-360. He later testified that he expected retaliation in response to Laws's death. Tr. 361. Patrolman Crish explained that he had learned, from his experience as a police officer and by working with Detective Stechschulte, that Laws had been associated with East Side gangs ("East Side"). Tr. 362, 364. Smith and Omosikeji were associated with North Side gangs ("North Side"). Tr. 624, 679. Patrolman Crish testified that East Side and North Side gangs were rivals. Tr. 363. The police believed that Omosikeji shot Laws as part of an "ongoing feud" between them. Tr. 641.

{¶5} On June 14, 2019, believing that retaliation was possible, Patrolman Crish drove his cruiser to McKibben Street in Lima, Ohio and parked about one block away from where a Romelo Blackman ("Romelo") lived. Tr. 362, 366-367. Romelo was Lakendra's son in addition to being Smith and Willie Jr.'s brother. Tr.

362, 365, 410, 687. Romelo was also associated with a North Side gang. Tr. 362. Given these connections, Patrolman Crish believed that Romelo's address might be a potential site for retaliatory action. Tr. 362, 365.

{¶6} After he parked his cruiser, Patrolman Crish got out of his car and walked on foot towards Romelo's address. Tr. 367. Within about twenty minutes of his arrival, he observed a vehicle driving past Romelo's house and heard some yelling. Tr. 367. He then "heard a couple gunshots go off and then a car quickly sped away." Tr. 367. Patrolman Crish saw several people from Romelo's house get into a vehicle and drive after the car. Tr. 368. "A couple minutes after that from farther west of us we could hear more shots go off." Tr. 368.

{¶7} Patrolman Crish testified that the police continued to "ke[ep] eyes on [Romelo's] house" given the continued potential for retaliation. Tr. 369. He also stated that the police "then kept tabs on when the funeral for Christian [Laws] was going to be" because, in his experience, retaliatory events have been known to occur after funerals in similar situations. Tr. 369, 371. The police became aware that Laws's funeral was going to occur on June 21, 2019 in the vicinity of the intersection of Cole Street and Edgewood Drive in Lima, Ohio. Tr. 371, 373.

{¶8} On the afternoon of June 21, 2019, Romelo asked a friend, Jayden Cartagena ("Cartagena") to drive him to Wally's Fillin' Station ("Wally's") in Lima, Ohio because he wanted to buy some food. Tr. 268-269. Wally's is located near the intersection of Cole Street and Edgewood Drive. Tr. 451. Ex. 114.

Cartagena met Romelo at his address on McKibben and then drove him to Wally's in his (Cartagena's) pickup truck. Tr. 270-271. Cartagena parked his vehicle at Wally's, and Romelo went inside. Tr. 271, 273. A few moments later, Romelo came back from the gas station store with a pizza and got into the passenger side of Cartagena's vehicle. Tr. 273, 275.

{¶9} In between 2:45 P.M. and 3:00 P.M., Cartagena began to drive his vehicle out of Wally's parking lot and onto the street. Tr. 275, 383. He testified that,

> **[w]hen I pulled up to the road I had glanced to my left and the \* \* \* I didn't see anything and then all of a sudden I just heard shots fired and then I \* \* \* just started like yelling at Romelo. I'm like, 'What—what is going on,' you know, I end up pressing on the gas and taking off and \* \* \* that's when we're going south \* \* \* on Cole Street going towards Robb.**

Tr. 276. He further testified that he "heard several gunshots. It wasn't just one. It just was \* \* \* repeatitive [sic] \* \* \*. Tr. 276.

{¶10} Cartagena then began driving to a nearby relative's house. Tr. 277. Cartagena later testified that, during this portion of the drive, he asked Romelo "what [was] \* \* \* going on" and that Romelo "didn't say nothing." Tr. 278. When he got to his relative's house, Cartagena called the police. Tr. 277. Romelo contacted his mother, who picked him up and took him home. Tr. 289. Cartagena testified that he did not speak to Romelo after this incident because he "was

obviously upset, you know, that [Romelo] * * * wasn't telling * * * [him] what was—what he got himself into." Tr. 289-290.

{¶11} At the time of the shooting, Cynthia Wall ("Wall") was doing yardwork outside of her house across the street from Wally's on Cole Street. Tr. 230-232. At first, she "thought some fireworks was [sic] going off * * *." Tr. 231, 232. She testified that she "look[ed] up and there was some young fellow that stepped out of the third bay [of the carwash next to Wally's] and was shooting off a gun." Tr. 232, 235. Wall said that "[h]e was waiving [sic] the gun * * * and then he aimed it right at me and I took off running because I was scared to death that the bullets was going to come flying to me." Tr. 236. Wall testified that she could only see one shooter at this carwash and later identified Wilson as the young man who she had seen firing the gun on June 21, 2019. Tr. 237-238, 241.

{¶12} At this time, Paul Custer ("Custer") was also outside of his house on the opposite side of Cole Street as Wally's. Tr. 246. He was installing a screen door at his house with his stepson when they "heard what [they] * * * believed to be shots from a weapon." Tr. 248. They "looked down the street towards Wally's Fillin['] Station and * * * s[aw] activity down there * * *." Tr. 248. Custer later inspected the exterior of his house and "found that a round had went through two of my windows and lodged in the frame of [the] * * * window to my laundry room." Tr. 248. Ex. 11-17.

{¶13} Charles Kamler ("Kamler") was also in the vicinity of Wally's at the time of this shooting. Tr. 219. He was driving one of two charter buses that were carrying a total of forty-eight children who were returning to Lima after visiting a residential camp. Tr. 216. Kamler testified that his bus was at a stoplight at the intersection of Cole Street and Edgewood Drive when he "heard a couple of quick pop, pop, pop, pop * * *." Tr. 217. He turned towards the sound and, from his vantage point, could see "two guys and they were firing pistols." Tr. 218. He could not provide a description of the shooters beyond confirming that they were wearing black clothing and that one of them was firing his pistol with his left hand. Tr. 220, 228.

{¶14} Kamler "told the kids to get down" and then called 9-1-1. Tr. 221. He later testified that he was concerned because he saw the shooters go in the same direction that the buses were headed. Tr. 224. For this reason, when the buses arrived at the church where the parents were to pick up the children, Kamler immediately brought the children inside the building and "locked everything down * * *." Tr. 225. The buses were equipped with video cameras. Tr. 217. The State obtained footage from the charter bus cameras and played the recordings at trial. Ex. 7. Tr. 222-223.

{¶15} Kayaunna Mayer ("Mayer") testified that she was in a car with her cousin at a stoplight at the intersection of Cole Street and Edgewood Drive on the afternoon June 21, 2019. Tr. 203-204. She saw "two people, maybe three," who

were "behind the carwash, we seen someone hiding behind a pole, somebody beside like the carwash." Tr. 205, 206. Mayer recognized one of these individuals as Hezekiah Williams ("Hezekiah"), who was a friend of her cousin. Tr. 207. She testified that Hezekiah "wasn't doing anything." Tr. 207. She then heard gunshots but could not see who was firing the gun. Tr. 208-209.

{¶16} However, Mayer did testify that "it didn't look like he [Hezekiah] was shooting at all * * *" and affirmed that she did not observe "anything with Hezekiah that would indicate he * * * may be a shooter[.]" Tr. 209. She further stated that Hezekiah was wearing a suit because she "believe[d] there was a funeral that day" that was for Laws. Tr. 210. Mayer and her cousin subsequently approached a police officer on the scene and reported that they had seen Hezekiah at the carwash at the time of the shooting. Tr. 209-210.

{¶17} The police examined the footage from security cameras positioned in the area around Wally's. Ex. 18, 22. In this footage, a white car can be seen driving north on Cole Street and passing Wally's. Ex. 22. This white car then made a U-turn and began driving south on Cole Street towards Wally's. Tr. 325-326, 694. Ex. 22. The white car stopped on Cole Street in front of Wally's to let three individuals get out of the vehicle. Ex. 18. These three individuals walked towards the carwash. Ex. 18. The white car then pulled off of Cole Street and into the parking lot of Wally's. Ex. 18. After the white car stopped next to one of the pumps, an individual wearing a bright yellow shirt exited from the back seat of the vehicle

and went into the gas station store. Ex. 18. The driver never left the car or pumped any gas. Ex. 18. Tr. 328. After the person in the yellow shirt left the gas station store, he got back into the white car, which then left Wally's parking lot. Ex. 18.

{¶18} The police investigators also located a total of nineteen shell casings in the vicinity of the carwash next to Wally's. Tr. 440. Eleven of these shell casings were found in an area in front of the third bay of the carwash while eight of these shell casings were found in an area around the corner of the other end of the carwash. Tr. 431, 438, 440. Ex. 29, 30. The police were also able to recover one bullet from a window frame at Custer's house and one bullet from a headrest in Cartagena's pickup truck. Tr. 246, 382, 455, 464.

{¶19} Patrolman Crish received the information that Hezekiah was a possible suspect and that a white vehicle was involved in the shooting after he responded to a report of a shooting "in the area of Cole and Edgewood." Tr. 373, 379-380, 387. The police obtained Hezekiah's address, which was on Feeman Avenue in Lima, Ohio. Tr. 385-386. Patrolman Crish and his partner went to this address and observed a white Toyota Corolla in the driveway. Tr. 387. He approached this vehicle and observed a pamphlet for Laws's funeral inside. Tr. 387.

{¶20} Patrolman Crish then knocked on the front door of the house, and Hezekiah's mother, Maria Williams ("Maria"), answered. Tr. 323, 388, 389. She told the police that she had not seen Hezekiah in weeks. Tr. 390. Patrolman Crish asked if she had seen Wilson because he believed Wilson to be associated with an

East Side gang called Manniworld. Tr. 390. Maria stated that Wilson was not in her house. Tr. 390. She allowed the police to go walk through her house to verify that Hezekiah and Wilson were not present. Tr. 390.

{¶21} After talking with Maria, Patrolman Crish's partner noticed that a nearby business had a security camera directed at Maria's house. Tr. 390. The officers went to this business and viewed the footage from that afternoon. Tr. 391-392. On the video recording, they observed Maria drive the white car into her driveway and exit the vehicle with another male, who was wearing a bright yellow shirt. Ex. 25. Tr. 391. This male was later identified as Marcus Manley ("Manley"). Tr. 392. The recording also captured footage of a person, who the officers believed to be Hezekiah, visiting Maria's house that afternoon. Tr. 392.

{¶22} On June 21, 2019, Maria was taken to the police station for an interview with Detective Stechschulte. Tr. 329, 697. At this time, Maria confirmed that Wilson, who she knew by the nicknames "O" or "Oaty," was one of the individuals in the car with her when she drove to Wally's earlier that day. Tr. 324, 697. She also told Detective Stechschulte that she witnessed Wilson firing a gun there while she was in her car next to a gas pump at Wally's. Tr. 331.

{¶23} On the night of June 21, 2019, the police received information that Hezekiah was at an address on Penny Lee Drive in Lima, Ohio. Tr. 399, 479. Lieutenant Gary Hook ("Lt. Hook"), who works for the Allen County Sheriff's Office, went to this address to search for Hezekiah. Tr. 473-474. After he arrived,

Lt. Hook knocked on the front door at the address he received. Tr. 474. When a woman answered the front door, Lt. Hook smelled "the odor of raw marijuana coming from the residence." Tr. 474.

{¶24} Patrolman Crish was also dispatched to this address on Penny Lee Drive and assisted Lt. Hook that night. Tr. 397-398. Once the officers obtained entrance into the residence, Patrolman Crish located Hezekiah inside and took him into custody. Tr. 398. The police also found Wilson in the residence and apprehended him. Tr. 476, 477. Two Taurus pistols were recovered at this location. Tr. 492-493, 494-495. Ex. 89, 98, 99, 100. After testing, one of these pistols was found to match the eleven shell casings from the third bay of the carwash, the bullet from Custer's house, and the bullet from Cartagena's headrest. Ex. 97. Tr. 583, 585. The other pistol was found to match the eight shell casings found at the corner of the carwash. Ex. 97. Tr. 583, 585.

{¶25} On June 22, 2019, Detective Stechschulte interviewed Wilson at the police station.[1] Ex. 102. By this point, the police had identified four of the five people who had been in the white car at Wally's. Tr. 694, 696, 711. During the interview, Wilson confirmed that he was at Laws's funeral and that he left with Maria. Ex. 102. He also gave Detective Stechschulte the name of the "fifth person in that car, which was Jamaree Allen" ("Allen"). Tr. 711.

---

[1] Detective Stechschulte first sat down with Wilson just before midnight on June 21, 2019. Ex. 102. However, the actual interview occurred on June 22, 2019. Ex. 102.

{¶26} On August 15, 2019, Wilson was indicted on one count of participating in a criminal gang in violation of R.C. 2923.42(A), a felony of the second degree, with a firearm specification; two counts of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree, each with a criminal gang activity specification and a firearm specification; one count of discharging a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3), a felony of the third degree, with a firearm specification; one count of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1), a felony of the second degree, with a criminal gang activity specification and a firearm specification; carrying a concealed weapon in violation of R.C. 2923.12(A)(2), a felony of the second degree, with a specification for forfeiture of a weapon; one count of improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16(B), a felony of the fourth degree; and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree. Doc. 4.

{¶27} On February 11, 2020, the State filed a supplemental response to Wilson's demand for discovery that disclosed that the State intended to call Detective Stechschulte as an expert witness on gang related activity. Doc. 221, 192. On March 23, 2020, Wilson filed a motion in limine that argued that Detective Stechschulte should not be permitted to testify as an expert witness at trial. Doc.

200. After holding a hearing on this matter on May 29, 2020, the trial court overruled Wilson's motion in limine on August 12, 2020. Doc. 221.

{¶28} A jury trial was held in between September 28 and October 2, 2020. Tr. 1. The State called sixteen witnesses to testify, including Maria and Detective Stechschulte. Tr. 322, 598. At trial, the State made a motion to grant Maria transactional immunity. Tr. 293. Over the Defense's objection, the trial court granted Maria immunity after she invoked her Fifth Amendment right against self-incrimination. Tr. 299-300, 318-319, 322.

{¶29} Maria then testified that she drove Manley, Hezekiah, Wilson, and Allen to Laws's funeral on June 21, 2019 in her white car. Tr. 323-324. When they left the funeral, she was driving while Hezekiah was in the front, passenger seat. Tr. 325. Manley, Allen, and Wilson were in the back seat. Tr. 325. She was driving north on Cole Street, made a U-turn on the roadway, and began driving towards Wally's. Tr. 326, 328. Ex. 18, 22.

{¶30} Before she pulled into Wally's parking lot, she let Hezekiah, Allen, and Wilson out of the vehicle. Tr. 326, 328. Ex. 18, 22. She then parked beside a pumping station where Manley exited the vehicle. Tr. 335. She testified that she saw Wilson shooting a gun while she was in her car beside the gas pump. Tr. 331, 332-333. When she left Wally's, Manley and Hezekiah were the only ones who were in the car with her. Tr. 328-329. She then dropped Hezekiah off at the house where Wilson's mother and brother lived. Tr. 333.

**{¶31}** When the State called Detective Stechschulte to testify as an expert witness, the Defense renewed its prior objection. Tr. 604. However, the trial court "recognize[d] Detective Stechschulte as an expert in gang[s] and gang related activity * * * in the Lima, Allen County, Ohio area." Tr. 604-605. The trial court also overruled the Defense's objection to the admission of a report authored by Detective Stechschulte and referenced during his testimony. Tr. 758, 760. Ex. 112.

**{¶32}** On October 2, 2020, Wilson was found guilty of all of the charges and specifications presented to the jury. Doc. 357. The trial court immediately proceeded to sentencing and issued its judgment entry of sentencing on October 14, 2020. Doc. 360. The trial court imposed prison terms for each of Wilson's convictions. Doc. 360. The trial court then ordered all of the prison terms that were imposed to be served consecutively. Doc. 360.

**{¶33}** Wilson filed his notice of appeal on October 19, 2020. Doc. 363. On appeal, he raises the following seven assignments of error:

**First Assignment of Error**

**The trial court erred to the prejudice of Mr. Wilson as there was insufficient evidence to convict.**

**Second Assignment of Error**

**The trial court erred to the prejudice of Mr. Wilson because the verdict was against the manifest weight of the evidence.**

**Third Assignment of Error**

**The cumulative effect of Defense counsel's errors violated Mr. Wilson's right to effective assistance of counsel, as guaranteed by the United States Constitution and the Constitution of the State of Ohio.**

**Fourth Assignment of Error**

**The trial court abused its discretion when it allowed Detective Stechschulte to testify as an expert witness.**

**Fifth Assignment of Error**

**The trial [court] erred and violated Mr. Wilson's due process when it granted Maria Williams immunity under R.C. 2945.44.**

**Sixth Assignment of Error**

**The trial court erred when it admitted an expert witness report into evidence.**

**Seventh Assignment of Error**

**Imposition of consecutive sentences is contrary to law when the findings made in support of the imposition of the consecutive sentences are not supported by the record.**

For the sake of analytical clarity, we will first examine Wilson's fourth, fifth, and sixth assignments of error. We will then consider his first and second assignments of error together in one analysis before we examine his third and seventh assignments of error.

*Fourth Assignment of Error*

{¶34} Wilson argues that the trial court erred in allowing Detective Stechschulte to testify as an expert witness at trial.

Legal Standard

**{¶35}** "Different rules govern the admissibility of opinion testimony from expert witnesses and lay witnesses." *State v. Duncan*, 3d Dist. Allen No. 1-19-75, 2020-Ohio-3916, ¶ 8.

> **The distinction between lay and expert witness opinion testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'**

*State v. McKee*, 91 Ohio St.3d 292, 2001-Ohio-41, 744 N.E.2d 737, fn. 2 (2001), quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992), *superseded on other grounds by statute*.

**{¶36}** As an initial matter, "expert testimony must meet the threshold of being relevant to a trial issue." *State v. York*, 2018-Ohio-612, 107 N.E.3d 672, ¶ 46 (2d Dist.), citing Evid.R. 401. If the testimony is relevant, then the expert witness and his or her testimony must be evaluated under Evid.R. 702, which reads, in its relevant part, as follows:

> **A witness may testify as an expert if all of the following apply:**
>
> **(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;**
>
> **(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;**
>
> **(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.  * * *.**

Evid.R. 702. "The Ohio Supreme Court has clearly held that police officers may qualify as expert witnesses where they possess specialized knowledge that will assist the fact-finder." *State v. Essa*, 194 Ohio App.3d 208, 2011-Ohio-2513, 955 N.E.2d 429, ¶ 132 (8th Dist.), citing *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 116. Further,

> **[a] witness who possesses 'specialized knowledge about gang symbols, cultures, and traditions beyond that of the trier of fact,' may be qualified as an expert on gang-related matters. * * * *Drummond* * * * [at] ¶ 116. 'Unlike scientific testimony, expert testimony about gangs depends heavily on the expert's knowledge and experience rather than on the expert's methodology and theory.' *Id*. at ¶ 119.**

*State v. White*, 12th Dist. Butler No. CA2019-07-118, 2020-Ohio-3313, ¶ 19. *See State v. McCraney*, 9th Dist. Summit Nos. 24750, 25285, 2010-Ohio-6128, ¶ 24.

{¶37} "We are to apply an abuse of discretion standard when reviewing a trial court's decision regarding an expert witness' testimony." *State v. McCray*, 3d Dist. Defiance No. 4-99-15, 2000-Ohio-1887, 2000 WL 799092, *4 (June 21, 2000). "An abuse of discretion is not merely an error of judgment." *State v. Costell*, 3d Dist. Union No. 14-21-02, 2021-Ohio-4363, ¶ 22, quoting *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 20 (3d Dist.). "Rather, an abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious." *State v. Kleman*, 3d Dist. Hardin No. 6-19-01, 2019-Ohio-4404, ¶ 18, quoting *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 23.

Legal Analysis

**{¶38}** At trial, the State called Detective Stechschulte to testify as an expert in gang-related activities in the Lima, Ohio area. Tr. 604. Information about gangs in the Lima area was relevant because Wilson was charged with the offense of participating in a criminal gang. Doc. 4. This offense requires the prosecution to establish the existence of a criminal gang and a pattern of criminal gang activity. R.C. 2923.2(A). *See* R.C. 2923.41(A-C). The trial court recognized Detective Stechschulte as an expert in gang related activity in the Allen County area over Wilson's objection. Tr. 604-605.

**{¶39}** On appeal, Wilson first argues that the trial court erred in determining that Detective Stechschulte was an expert in gang-related activity. At trial, the State questioned Detective Stechschulte on his training and experience. Tr. 599-603. He testified that, as a detective at the Lima Police Department, he was specifically involved in investigating gang-related criminal activity. Tr. 599. By the time of the trial, he had fourteen years of experience as a detective. Tr. 605. He had also completed eight gang investigation training programs with the National Gang Crime Research Center, including programs called Gang Homicide Investigation Skills; Gang Crime Investigative Skills; and The Advanced Gang Training Program. Ex. 101. Tr. 599, 601. *See White, supra*, at ¶ 31.

**{¶40}** Further, Detective Stechschulte testified that no other member of law enforcement in Allen County has completed the level of training that he has been

able to receive on this subject matter. Tr. 602. He also has consulted members of law enforcement in Fort Wayne, Columbus, and Detroit on gang-related matters. Tr. 603. Having reviewed the evidence in the record, we conclude that there is no indication that the trial court erred in determining that Detective Stechschulte was qualified to testify as an expert on gang-related activities.

{¶41} Next, Wilson argues that Detective Stechschulte's testimony did not contain information that was outside of the knowledge of the jurors. However, Detective Stechschulte's testimony contained extensive information about the history, membership, practices, connections, and criminal activities of the gangs that were operating in the Lima area. *White, supra*, at ¶ 12. He also interpreted the contents of several pictures and videos of Wilson that contained various symbols and gestures that were indicators of gang affiliations. Tr. 632-633, 636, 638, 639, 737-743. Ex. 103, 106, 107, 109, 113. Having examined Detective Stechschulte's testimony, we conclude that the information was clearly "beyond the knowledge or experience possessed by lay persons * * *." Evid.R. 702(A). *See* Tr. 603.

{¶42} Having reviewed the evidence in the record, we do not conclude that the trial court abused its discretion in allowing Detective Stechschulte to testify as an expert witness. His trial testimony was based on his extensive training and experience as a detective assigned to investigations of gang-related activities in the Lima area. Further, his testimony regarded information that is well outside of the

common knowledge and experience of the average juror. *See White, supra*, at ¶ 33.

For these reasons, Wilson's fourth assignment of error is overruled.

*Fifth Assignment of Error*

{¶43} Wilson argues that the trial court erred in granting Maria Williams transactional immunity pursuant to R.C. 2945.44.

Legal Standard

{¶44} "Transactional immunity * * * accords full immunity from prosecution for the offense to which the compelled testimony relates * * *." *State v. Broady*, 41 Ohio App.2d 17, 21-22, 321 N.E.2d 890, 894 (10th Dist.). "A court's sole authority for granting immunity is regulated by R.C. 2945.44." *State ex rel. Leis v. Outcalt*, 1 Ohio St.3d 147, 148, 438 N.E.2d 443, 445 (1982). This provision reads, in its relevant part, as follows:

> **(A) In any criminal proceeding in this state * * *, if a witness refuses to answer or produce information on the basis of the witness's privilege against self-incrimination, the court of common pleas of the county in which the proceeding is being held, unless it finds that to do so would not further the administration of justice, shall compel the witness to answer or produce the information, if both of the following apply:**
>
> **(1) The prosecuting attorney of the county in which the proceedings are being held makes a written request to the court of common pleas to order the witness to answer or produce the information, notwithstanding the witness's claim of privilege;**
>
> **(2) The court of common pleas informs the witness that by answering, or producing the information the witness will receive immunity under division (B) of this section.**

**(B) If, but for this section, the witness would have been privileged to withhold an answer or any information given in any criminal proceeding, and the witness complies with an order under division (A) of this section compelling the witness to give an answer or produce any information, the witness shall not be prosecuted or subjected to any criminal penalty in the courts of this state for or on account of any transaction or matter concerning which, in compliance with the order, the witness gave an answer or produced any information.**

R.C. 2945.44(A). Thus, unless the court of common pleas determines that a grant of immunity would not further the administration of justice, it is to compel the witness to testify provided that

**(1) the witness refuses to answer on the basis of his privilege against self-incrimination, (2) the prosecuting attorney makes a written request to order the witness to answer, and (3) the court informs the witness he will receive transactional immunity.**

*State ex rel. Koren v. Grogan*, 68 Ohio St.3d 590, 592, 1994-Ohio-327, 629 N.E.2d 446, 448-449 (1994), citing R.C. 2945.44(A).

**{¶45}** The determination as to whether a grant of immunity would further the administration of justice is committed to the sound discretion of the trial court. *State ex rel. Ney v. Niehaus*, 33 Ohio St.3d 118, 515 N.E.2d 914 (1987). Thus, an appellate court will not disturb such a determination in the absence of an abuse of discretion. *State v. Frye*, 2018-Ohio-894, 108 N.E.3d 564, ¶ 92 (3d Dist.). "An abuse of discretion is not merely an error of judgment." *Costell, supra*, at ¶ 22, quoting *Sullivan, supra*, at ¶ 20. "Rather, an abuse of discretion is present where

the trial court's decision was arbitrary, unreasonable, or capricious." *Kleman, supra*, at ¶ 18, quoting *Howton, supra*, at ¶ 23.

Legal Analysis

{¶46} Wilson directs our attention to the Ohio Supreme Court's decision in *State v. Landrum* to argue that, "when a witness asserts a privilege against self-incrimination, a court may not rely upon the witness's claim alone * * * [and] has a duty to determine if the witness's refusal to answer is justified." Appellant's Brief, 12, citing *State v. Landrum*, 53 Ohio St.3d 107, 120, 559 N.E.2d 710, 726 (1990). He asserts that the trial court failed to determine that Maria had grounds to invoke her right against self-incrimination before granting her immunity. *Id.*

{¶47} In *Landrum*, the defendant argued on appeal that the trial court erred by failing to grant immunity to a witness who had invoked his right against self-incrimination. *Id.* at 120. However, the prosecution did not request a grant of immunity for this witness. *Id.* In Ohio, "courts do not have inherent authority to immunize defense witnesses." *Id.* Thus, the trial court could not compel the witness to testify pursuant to a grant of immunity under R.C. 2945.44 and had to scrutinize whether the "witness's testimony would be self-incriminating" before excusing the witness. *Id. See also State v. McClellan*, 3d Dist. Allen No. 1-01-136, 2002-Ohio-1212, 2002 WL 418967, *2 (Mar. 19, 2002); *State v. Perry*, 8th Dist. Cuyahoga No. 84397, 2005-Ohio-27, ¶ 46.

{¶48} By contrast, in the case presently before this Court, the prosecution requested a grant of immunity for Maria pursuant to R.C. 2945.44 and made the trial court aware of Maria's grounds for invoking her right against self-incrimination. Tr. 318. The trial court was made aware that Maria was the alleged driver of the vehicle that had brought Wilson to Wally's on June 21, 2019; that Maria had been indicted for her alleged activities on June 21, 2019; and that the case surrounding the charges against Maria had not yet been resolved. Tr. 259, 303. The trial court was also aware that the matters about which Maria was called to testify were related to her involvement in the incident that gave rise to the charges against Wilson and were related to the charges against her. Tr. 259-260, 300-303, 306.

{¶49} In conclusion, Wilson has not, with this argument, demonstrated that the trial court erred in granting Maria immunity at trial. Further, the record does not contain any indication that the trial court failed to comply with the requirements of R.C. 2945.44 in granting immunity to Maria at trial. For these reasons, Wilson's fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶50} Wilson argues that the trial court erred in admitting an expert report that was authored by Detective Stechschulte into evidence, arguing that the expert report contains inadmissible hearsay.

Legal Standard

{¶51} Crim.R. 16 governs the discovery and inspection process. Crim.R. 16.

Crim.R. 16(K) states the following about the reports of expert witnesses:

> **An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.**

Crim.R. 16(K). An appellate court "will not reverse a trial court's ruling on evidentiary issues absent an abuse of discretion and proof of material prejudice." *State v. Thompson*, 2017-Ohio-792, 85 N.E.3d 1108, ¶ 18 (3d Dist.), quoting *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 181. Thus, a trial court's decision to admit or exclude the report of an expert witness will not be disturbed in the absence of an abuse of discretion. *State v. Brown*, 2017-Ohio-9259, 103 N.E.3d 32, ¶ 34 (11th Dist.).

Legal Analysis

{¶52} At trial, when the State proffered Detective Stechschulte's expert report for admission into evidence, the Defense objected on the grounds that the report contained hearsay statements. Tr. 761. Ex. 112. The trial court noted that the report proffered by the State had already been modified to remove the hearsay statements that were in the original report. Tr. 762, 763. The Defense then objected

-24-

to another statement that remained in the report on the grounds that it implicated Wilson in an offense that was unrelated to the charges in the present case. Tr. 764. The trial court informed the State that this statement had to be revised before the report could be admitted into evidence. Tr. 766. The trial court then examined the report and ordered the State to make several more revisions. Tr. 772, 774, 777. The report admitted into evidence reflects the revisions required by the trial court. Ex. 112.

{¶53} On appeal, Wilson asserts that Detective Stechschulte's expert report should not have been admitted into evidence because it contained inadmissible hearsay. Ex. 112. However, Wilson does not identify any hearsay statements in the report. The record indicates that the trial court was responsive to the objections that the Defense had at trial and took steps to ensure that no hearsay was in the final version of the report that was admitted into evidence. Tr. 760-775. Further, having reviewed the expert report, we conclude that the trial court did not abuse its discretion by admitting this report into evidence. Accordingly, Wilson's sixth assignment of error is overruled.

*First and Second Assignments of Error*

{¶54} Wilson argues that, if the evidence he has challenged as inadmissible in this appeal were to be excluded, then his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Appellant's Brief, 4-5. However, in our analyses of his fourth, fifth, and sixth assignments of

error, we have already concluded that the trial court did not err in admitting the evidence that he has challenged in this appeal. Thus, this argument is without merit.

{¶55} Next, Wilson generally asserts that the State failed to establish that "Wilson committed the crimes that were alleged." Appellant's Brief, 4. For this reason, we will examine his convictions to determine whether they are supported by sufficient evidence and the manifest weight of the evidence. We will begin our analysis by setting forth the general legal standards for sufficiency of the evidence and the manifest weight of the evidence. We will then proceed to examine each of Wilson's eight convictions under these standards.

Legal Standard for Sufficiency of the Evidence

{¶56} "A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial." *In re Swift*, 8th Dist. Cuyahoga No. 79610, 2002-Ohio-1276, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). This "analysis addresses the question of whether adequate evidence was produced for the case to be considered by the trier of fact and, thus, whether the evidence was 'legally sufficient to support the verdict * * *.'" *State v. Barga*, 3d Dist. Shelby No. 17-17-14, 2018-Ohio-2804, ¶ 8, quoting *State v. Worthington*, 3d Dist. Hardin No. 6-15-04, 2016-Ohio-530, ¶ 12.

{¶57} An appellate court is not to examine whether the evidence presented should be believed but should rather "examine the evidence admitted at trial to

determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Johnston*, 3d Dist. Logan No. 8-13-10, 2014-Ohio-353, ¶ 10, quoting *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991), *superseded by state constitutional amendment on other grounds, State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668 (1997). On appeal, the applicable standard

> **is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.**

*State v. Brown*, 3d Dist. Hancock No. 5-17-19, 2018-Ohio-899, ¶ 27, quoting *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1108, ¶ 62 (3d Dist.).

Legal Standard for Manifest Weight of the Evidence

{¶58} "In a manifest weight analysis, 'an appellate court determines whether the state has appropriately carried its burden of persuasion.'" *State v. Richey*, 2021-Ohio-1461, 170 N.E.3d 933, ¶ 29 (3d Dist.), quoting *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist. 1997). "Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict." *Plott, supra*, at ¶ 73. Thus, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *Thompkins, supra*, at 387. On appeal, courts

**must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'** *State v. Brentlinger*, **2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting** *Thompkins* **at 387.**

*State v. Schatzinger*, 3d Dist. Wyandot No. 16-20-04, 2021-Ohio-167, ¶ 52.

**{¶59}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *Sullivan*, *supra*, at ¶ 38, quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

**{¶60}** *First Count of Felonious Assault*: To establish a conviction for felonious assault in violation of R.C. 2903.11(A)(2), the State must prove that the defendant "[1] knowingly * * * [2] [c]ause[d] or attempt[ed] to cause physical harm to another * * * [3] by means of a deadly weapon * * *." R.C. 2903.11(A)(2). *See* Tr. 870. The first count of felonious assault alleged that Wilson discharged a firearm at Romelo while he was riding in Cartagena's pickup truck. Tr. 792.

{¶61} As to the sufficiency of the evidence, the State introduced the recording of an interview in which Wilson admitted that he attended Laws's funeral and left in Maria's car. Ex. 102. Tr. 711. Maria testified that Wilson was riding in her car after Laws's funeral and that Wilson got out of her car before she pulled into the parking lot at Wally's. Tr. 325-326, 328. At trial, Maria and Wall both identified Wilson as a person who was firing a gun beside Wally's on June 21, 2019. Tr. 237-238, 331.

{¶62} Romelo testified that, as Cartagena was driving away from Wally's, the "truck was getting hit from shots" and that "bullets was [sic] hitting the car." Tr. 405, 406. The police subsequently examined Cartagena's pickup truck and found several bullet holes in the vehicle. Tr. 382. The police investigators also recovered a bullet from the inside of the headrest of the seat in the pickup truck where Romelo was sitting. Tr. 382, 464. Ex. 87. The State introduced pictures of several bullet holes in Cartagena's pickup truck. Tr. 382, 463. Ex. 19-21, 82-86.

{¶63} Further, Wall indicated that Wilson "stepped out of the third bay" of the carwash next to Wally's when he was firing a gun.[2] Tr. 232. She stated that she could only see one person shooting during this incident. Tr. 241. Identification Officer Jerry Cress ("Officer Cress"), who works for the Allen County Sheriff's Office, testified that he examined the area around Wally's after the shooting on June

---

[2] Wall testified that she could only see one shooter at this carwash. Tr. 241. She stated that she observed the shooter firing his gun from near the third bay of the carwash. Tr. 235. She then identified the only shooter she could see as Wilson. Tr. 237-238.

21, 2019. Tr. 420-421. Altogether, Officer Cress recovered nineteen shell casings from the scene of the shootings. Tr. 432, 440. Eleven of these shell casings came from the area around the third bay of the carwash next to Wally's. Tr. 430-431. Ex. 29, 31, 33-43. Eight of these shell casings were recovered from an area on the other side of the carwash. Ex. 30, 32, 44-51.

{¶64} Kevin Kramer ("Kramer"), who works as a forensic scientist at the Ohio Bureau of Criminal Investigation, examined the nineteen shell casings that were discovered at Wally's. Tr. 562, 579, 582. Ex. 97. Kramer determined that the grouping of eleven shell casings had been fired by one gun while the other grouping of eight shell casings had been fired by another gun. Tr. 585-586. Ex. 97. He also determined that the bullet in Romelo's headrest came from the same gun that had fired the eleven shell casings that had been recovered from that area around the third bay of the carwash. Tr. 587. Ex. 81, 88, 97, 98, 99.

{¶65} Further, the gun that had fired these eleven shell casings was also recovered in the house where Wilson was apprehended on Penny Lee Lane. Tr. 492-493, 583, 585-586. Ex. 89, 97, 98, 99. Thus, having reviewed the materials in the record, we conclude that the State presented sufficient evidence from which a reasonable trier of fact could determine that Wilson was guilty of the first count of felonious assault.

{¶66} As to the manifest weight of the evidence, Romelo testified on cross-examination that he considered Wilson to be one of his associates; that he had never

-30-

had any problems with Wilson; and that it made no sense for Wilson to be firing a gun at him. Tr. 411. He also stated that, while his family had some problems with Hezekiah in the past, he did not believe that he had any problems with Hezekiah. Tr. 412, 413. He further stated that he did not know Allen. Tr. 412.

{¶67} On cross-examination, Maria testified that she had been charged with five felonies that were related to her activities on June 21, 2019 and that these felonies had been dismissed. Tr. 348. Ex. A. She had previously stated that she did not know Wilson, but she explained on cross-examination that she did not believe that this was a lie because she meant that she did not know him well. Tr. 338. Maria further stated that she had never seen Wilson with a criminal mindset before June 21, 2019 and that she was not afraid of Wilson prior to this incident. Tr. 353-354. Unlike Wall, Maria could not remember if Wilson was standing in one of the bays at the carwash next to Wally's when he was firing a gun. Tr. 330-331.

{¶68} Maria also testified that Hezekiah was her son and that he had been arrested at the same time as Wilson. Tr. 339, 340. She testified that Wilson, Allen, and Hezekiah got out of her car at the same time but insisted that her son "didn't get out [of her car] to shoot nobody[.]" Tr. 339, 345-346. She indicated that she did not know why her son got out of her car at Wally's. Tr. 345-346. However, as Detective Stechschulte noted in his testimony, she can be seen making a U-turn with her car after passing Wally's; stopping her car on the side of the road to let Allen,

Hezekiah, and Wilson out; and then waiting by a gas station pump until the shooting had ceased and Manley had returned to the car. Ex. 22. Tr. 694-695.

{¶69} Maria testified that neither Manley nor Hezekiah had a firearm when they got back into her car. Tr. 350. However, she also testified that she did not see any firearms in the vehicle before or after the shooting. Tr. 350. Patrolman Crish also testified that Maria had not been truthful with the police when she told them that she had not seen Hezekiah for weeks before the shooting on June 21, 2019. Tr. 402.

{¶70} Detective Stechschulte was also questioned on cross-examination about a statement made during his interview with Wilson. Tr. 746. Ex. 102. He had said to Wilson that Hezekiah and Maria were not going to take a hit for something that neither of them had done. Tr. 746. He stated that he meant that the evidence that the police had obtained indicated that Hezekiah and Maria did not fire a gun during the incident at Wally's on June 21, 2019. Tr. 746-747. For this reason, Detective Stechschulte said that he was suggesting to Wilson that Hezekiah and Maria were likely to tell the truth to the police because they were not likely to let a family member go to prison for firing a gun on June 21, 2019 if Wilson or Allen had been the shooters. Tr. 747.

{¶71} On cross-examination, Wall testified that she only saw one person firing a gun at the carwash she and that she was eighty percent certain that the shooter she observed was Wilson. Tr. 241, 242. Kramer testified that no DNA

testing or fingerprint testing was performed on the firearms to determine who had discharged them. Tr. 589. Officer Cress testified that he did not believe that a fingerprint analysis was conducted on the shell casings that were recovered at Wally's. Tr. 444-445. Having examined the materials presented at trial, we conclude that the conviction on this charge is not against the manifest weight of the evidence.

{¶72} *Second Count of Felonious Assault*: To establish a conviction for felonious assault in violation of R.C. 2903.11(A)(2), the State must prove that the defendant "[1] knowingly * * * [c]ause[d] or attempt[ed] to cause [3] physical harm to another * * * [4] by means of a deadly weapon * * *." R.C. 2903.11(A)(2). *See* Tr. 873-874. The second count of felonious assault alleged that Wilson discharged a firearm at Cartagena while he was driving his pickup truck away from Wally's. Tr. 792.

{¶73} Cartagena testified that Romelo was in the passenger seat of his vehicle when he heard multiple gunshots while he was driving away from Wally's and that he sped up his truck to get away from the gunfire. Tr. 276. He indicated that the shots were being fired at his vehicle. Tr. 282, 288. Cartagena testified that he drove to a nearby relative's house and called 9-1-1. Tr. 277. He observed a number of bullet holes in his truck that the police photographed. Tr. 281-282. The pictures taken of his vehicle by the police were admitted into evidence. Ex. 19-21. *See* Tr. 280.

{¶74} When Cartagena's statements are considered with the testimony from Maria, Wall, and Kramer that we reviewed under the first count of felonious assault, we conclude that the State presented sufficient evidence from which a reasonable trier of fact could determine that Wilson was guilty of the second count of felonious assault. Further, we reincorporate our analysis of the manifest weight of the evidence for the first count of felonious assault and conclude that the conviction on this charge is not against the manifest weight of the evidence.

{¶75} *Discharge of a Firearm On or Near Prohibited Premises*: To establish a conviction for a violation of R.C. 2923.162(A)(3) as a felony of the third degree, the State must prove that the defendant "[1] [d]ischarged a firearm [2] upon or over a public road or highway" and "[3] created a substantial risk of physical harm to any person or caused serious physical harm to property * * *." R.C. 2923.162(A)(3); R.C. 2923.162(C)(2). *See* Tr. 875.

{¶76} As to the sufficiency of the evidence, Wall and Maria testified that they observed Wilson firing a gun next to the carwash at Wally's. Tr. 238, 331. Wall also testified that she and her husband were doing yardwork on their property across from Wally's at the time of the shooting. Tr. 230. She saw Wilson waving his gun and then point the weapon at her. Tr. 236. Wall stated that she then ran into her backyard. Tr. 236. Kamler testified that he was in one of two buses that were on the roadway in front of Wally's at the time of the shooting. Tr. 217. There were forty-eight children in these two buses. Tr. 217. From his vantage point, he could

-34-

see two shooters firing guns. Tr. 218. The State introduced videos from the camera on the bus that showed the children reacting to hearing the gunfire. Tr. 223.

{¶77} Detective Stechshulte testified that, based on the context of this incident, Romelo "was obviously the target" of this shooting. Tr. 715. Both Cartagena and Romelo indicated that they were on the roadway when their vehicle was struck by gunfire. Tr. 276, 282, 405-406. While the police recovered eleven shell casings in the area from which Wilson was seen firing a gun, one bullet was found lodged in Cartagena's pickup truck. Tr. 431, 438, 440, 464. Ex. 29, 30.

{¶78} Identification Officer Michael Carman ("Officer Carman"), who works for the Lima Police Department, testified that he investigated the area around Wally's on June 21, 2019 and found bullet holes in two cars located in a driveway across the street from Wally's. Tr. 449-451, 454. Ex. 76-78. He also discovered several trees on the other side of the street from Wally's that had been struck by bullets. Tr. 453, 455. Ex. 79-80. The State introduced the pictures of these two cars and these trees into evidence at trial. Ex. 76-80. Having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence from which a reasonable trier of fact could determine that Wilson was guilty of discharging a firearm on or near prohibited premises.

{¶79} As to the manifest weight of the evidence, Kamler testified that he could not identify either of the two persons he saw firing guns. Tr. 220. He could only determine that one of the two persons was left-handed. Tr. 228. We also

reincorporate the statements made by Maria, Wall, and Kramer on cross-examination that we considered in our analysis of the first charge of felonious assault. Having examined the materials presented at trial, we conclude that the conviction on this charge is not against the manifest weight of the evidence.

{¶80} *Improperly Discharging a Firearm at or into a Habitation*: To establish a conviction for improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1), the State must prove that the defendant, "[1] without privilege to do so, * * * [2] knowingly * * * [d]ischarged a firearm [3] at or into an occupied structure that is a permanent or temporary habitation of any individual." R.C. 2923.161(A)(1). *See* Tr. 879.

{¶81} As to the sufficiency of the evidence, Custer testified that he was installing a screen door on his house with his stepson when he heard gunfire. Tr. 246. He stated that he observed activity coming from the area of Wally's down the street and that he headed in that direction to see what was happening. Tr. 248. After he returned to his property, he examined the exterior of his house. Tr. 248. He discovered that two of his windows were broken and found that a bullet was lodged in one of his window frames. Tr. 248. Ex. 11-17. When asked, Custer stated that he had not given anyone permission to fire a gun at his house. Tr. 253.

{¶82} The police investigators recovered a bullet from the window frame on Custer's house. Tr. 455. Ex. 81. Kramer determined that this bullet and the eleven shell casings found at the third bay of the carwash had been fired by the same gun.

-36-

Tr. 585-587. Ex. 97. Again, Wall had testified that Wilson had been firing a gun from the area around the third bay of the carwash next to Wally's. Tr. 232, 237-238. Thus, having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence from which a reasonable trier of fact could determine that Wilson was guilty of improperly discharging a firearm at or into a habitation.

{¶83} On cross-examination, Custer admitted that he did not know who had fired the gun that damaged his house. Tr. 254. We again reincorporate the manifest weight analysis conducted under the first count of felonious assault. Having examined the materials presented at trial, we conclude that the conviction on this charge is not against the manifest weight of the evidence.

{¶84} *Carrying a Concealed Weapon*: To establish a conviction for carrying a concealed weapon in violation of R.C. 2923.12(A)(2) as a felony of the fourth degree, the State must prove that the defendant "[1] knowingly carr[ied] or ha[d] * * * [2] a handgun" that was "concealed on [his] * * * person or concealed ready at hand" and was "loaded or for which the offender ha[d] ammunition ready at hand * * *." R.C. 2923.12(A)(2); R.C. 2923.12(F)(1). *See* Tr. 887.

{¶85} As to the sufficiency of the evidence, the State introduced testimony from Maria and Wall that indicated that Wilson had a gun at Wally's. Tr. 232, 237-238, 331. During his interview with Detective Stechschulte, Wilson admitted that he was at Laws's funeral and that he had left the funeral with Maria. Tr. 711. Ex.

-37-

102. Further, Maria testified that she drove Wilson to Laws's funeral and drove him from Laws's funeral to Wally's. Tr. 323-324. She stated that she did not see Wilson with a gun while he was in the car but that she did see him firing a gun near to Wally's. Tr. 350. Maria further testified that she did not see any guns in her car "before or after" the shooting. Tr. 350.

{¶86} In the video footage from the security cameras around Wally's, Wilson and two others can be seen getting out of Maria's vehicle on Cole Street. Ex. 22. These three individuals proceeded immediately to the area around the carwash where the shots were fired at Cartagena's vehicle down the street. Ex. 22. Tr. 232, 237-238. Having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence from which a reasonable trier of fact could determine that Wilson was guilty of carrying a concealed weapon.

{¶87} As to the manifest weight of the evidence, we again reincorporate the evidence that we considered in the manifest weight analysis conducted under the first count of felonious assault. Having examined the materials presented at trial, we conclude that the conviction on this charge is not against the manifest weight of the evidence.

{¶88} *Improperly Handling Firearms in a Motor Vehicle*: To establish a conviction for improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B), the State must prove that the defendant "[1] knowingly transport[ed] or ha[d] a loaded firearm [2] in a motor vehicle [3] in such a manner that the firearm

[was] accessible to the operator or any passenger without leaving the vehicle. R.C. 2923.16(B). *See* Tr. 890-891.

{¶89} As to the sufficiency of the evidence, Maria and Wall saw Wilson firing a gun at a carwash. Tr. 232, 237-238, 331. The State introduced video footage from a security camera near Wally's in which three individuals, including Wilson, can be seen getting out of the white car on Cole Street and walking towards the carwash area. Ex. 22. None of these individuals can be seen getting a weapon outside of the trunk or any other place that was not accessible without leaving the vehicle. Ex. 22. They immediately proceeded to the area around the carwash and were readily able to begin firing at Cartagena's pickup truck. Ex. 22. Having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence from which a reasonable trier of fact could determine that Wilson was guilty of improperly handling firearms in a motor vehicle.

{¶90} As to the manifest weight of the evidence, we again reincorporate the evidence that we considered in the manifest weight analysis conducted under the first count of felonious assault. Having examined the materials presented at trial, we conclude that the conviction on this charge is not against the manifest weight of the evidence.

{¶91} *Having Weapons While under Disability*: To establish a conviction for having weapons while under disability in violation of R.C. 2923.13(A)(2), the State must prove that the defendant "[1] knowingly acquire[d], ha[d], carr[ied], or use[d]

-39-

any firearm or dangerous ordinance" [2] even though he had previously "been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence." R.C. 2923.13(A)(2).[3]

{¶92} As to the sufficiency of the evidence, Maria and Wall testified that they saw Wilson firing a gun at Wally's on June 21, 2019. Tr. 232, 238, 331. Further, "the parties stipulated that the defendant knew that he had been adjudicated a delinquent child for the commission of an offense of violence" in 2008. Tr. 895. Tr. 150-153, 799. Having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence from which a reasonable trier of fact could determine that Wilson was guilty of having a weapon while under disability.

{¶93} As to the manifest weight of the evidence, we again reincorporate the evidence that we considered in the manifest weight analysis conducted under the first count of felonious assault. Having examined the materials presented at trial, we conclude that the conviction on this charge is not against the manifest weight of the evidence.

{¶94} *Participating in a Criminal Gang*: To establish a conviction for participating in a criminal gang in violation of R.C. 2923.42(A), the State must

---

[3] R.C. 2923.13(A)(2) reads as follows: "*Unless relieved from disability under operation of law or legal process*, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if * * * [t]he person * * * has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense of violence." (Emphasis added.) However, "proving relief from a disability is an affirmative defense that must be raised by the defendant." *State v. Gatewood*, 2021-Ohio-3325, 177 N.E.3d 693, ¶ 26 (1st Dist.). Establishing that the defendant has not been relieved from disability "is not an element of the offense which must be proven by the state * * *." *State v. Gibson*, 89 Ohio App.3d 188, 192, 623 N.E.2d 1266, 1269 (3d Dist. 1993).

prove that the defendant "[1] actively participate[d] in a criminal gang, [2] with knowledge that the criminal gang engages in or has engaged in a pattern of criminal gang activity" and "[3] purposely promote[d], further[ed], or assist[ed] any criminal conduct * * *, or * * * purposely commit[ted] or engage[d] in any act that constitutes criminal conduct * * *."  R.C. 2923.42(A).

{¶95} R.C. 2923.41(A) defines a "criminal gang" as "[1] an ongoing formal or informal organization, association, or group of three or more persons" that "[2] has as one of its primary activities the commission of one or more of the offenses listed in * * *" R.C. 2923.41(B), that "[3] has a common name or one or more common identifying signs, symbols, or colors," and [4] in which the associated "persons * * * individually or collectively engage in or have engaged in a pattern of criminal gang activity."  R.C. 2923.41(A).  A partial list of the offenses in R.C. 2923.41(B) includes felonies, violent offenses, trafficking offenses in violation of R.C. 2925.03, and improperly handling firearms in a motor vehicle in violation of R.C. 2923.16.  R.C. 2923.41(B)(1).

{¶96} R.C. 2923.41(B) defines when a "pattern of criminal gang activity" exists.  R.C. 2923.41(B).  First, pursuant to R.C. 2923.41(B)(1), the

> **persons in the criminal gang [must] have committed, attempted to commit, conspired to commit, been complicitors in the commission of, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of two or more of any of the following offenses:**

**(a) A felony or an act committed by a juvenile that would be a felony if committed by an adult;**

**(b) An offense of violence or an act committed by a juvenile that would be an offense of violence if committed by an adult;**

**(c) A violation of section 2907.04, 2909.06, 2911.211, 2917.04, 2919.23, or 2919.24 of the Revised Code, section 2921.04 or 2923.16 of the Revised Code, section 2925.03 of the Revised Code if the offense is trafficking in marihuana, or section 2927.12 of the Revised Code.[4]**

R.C. 2923.41(B)(1). Second, pursuant to R.C. 2923.41(B)(2),

**the following [must] apply with respect to the offenses that are listed in [R.C. 2923.41(B)(1)] * * * and that persons in the criminal gang committed, attempted to commit, conspired to commit, were in complicity in committing, or solicited, coerced, or intimidated another to commit, attempt to commit, conspire to commit, or be in complicity in committing:**

**(a) At least one of the two or more offenses is a felony.**

**(b) At least one of those two or more offenses occurs on or after January 1, 1999.**

**(c) The last of those two or more offenses occurs within five years after at least one of those offenses.**

**(d) The two or more offenses are committed on separate occasions or by two or more persons.**

---

[4] The offenses listed in R.C. 2923.41(B)(1)(c) include unlawful sexual conduct with a minor in violation of R.C. 2907.04; criminal damaging or endangering in violation of R.C. 2909.06; aggravated trespass in violation of R.C. 2911.211; failure to disperse in violation of R.C. 2917.04; interference with custody in violation of R.C. 2919.23; contributing to unruliness or delinquency in violation of R.C. 2919.24; intimidation of an attorney, victim, or witness in a criminal case in violation of R.C. 2921.04; improperly handling firearms in a motor vehicle in violation of R.C. 2923.16; trafficking offenses in violation of R.C. 2925.03 "*if* the offense is trafficking in marihuana"; and ethnic intimidation in violation of R.C. 2927.12. (Emphasis added.) R.C. 2923.41(B)(1)(c).

R.C. 2923.41(B)(2). The definition of "criminal conduct" in R.C. 2923.41(C) includes the following:

> **the commission of, an attempt to commit, a conspiracy to commit, complicity in the commission of, or solicitation, coercion, or intimidation of another to commit, attempt to commit, conspire to commit, or be in complicity in the commission of an offense listed in [R.C. 2923.41(B)(1)] * * *.**

R.C. 2923.41(C). Again, R.C. 2923.41(B)(1) lists felony offenses, offenses of violence, and various other offenses that include improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16. R.C. 2923.41(B)(1). *See* Tr. 864-869.

{¶97} As to sufficiency of the evidence, Detective Stechschulte testified that, in recent years, gangs have transitioned from being larger associations to being smaller associations that would form local alliances with each other. Tr. 607-608. In his testimony, he mentioned that North Side, East Side, and South Side gangs ("South Side") are operating in the Lima area. Tr. 618, 624. The North Side encompasses a gang called the Most Demanded Boys ("MDB"). Tr. 624.

{¶98} Detective Stechschulte said that, in the Lima area, the South Side gangs have "kind of aligned themselves a lot of times with * * * [the] East Side" gangs. Tr. 618. The East Side encompasses a gang called "Manniworld." Tr. 610, 668-669. The name "Manniworld" came "from Damani McMillan who was killed in a car crash up in Detroit several years ago and a lot of the individuals that began Manniworld were friends of his and classmates of his." Tr. 616. Detective Stechschulte indicated that East Side gangs were in conflict with North Side gangs.

Tr. 687. Patrolman Crish also affirmed that North Side and East Side were "rival" gangs. Tr. 363.

{¶99} Detective Stechschulte testified that these gangs were involved in drug trafficking and that this was "normally one of the[ir] primar[y] activities." Tr. 610. He also stated that these gangs were also involved in robberies, burglaries, prostitution, human trafficking, and other fraudulent activities. Tr. 611. He stated that the gangs engage in "felonious assaults that may or may not be associated with one of those primary crimes to gain money * * *." Tr. 612. However, he also stated that the gangs sometimes engage in violent crimes "as a retaliatory thing against another one of those gangs * * *." Tr. 612. He affirmed that the "primary activities" of the East Side gang are "to commit * * * felonies[.]" Tr. 642.

{¶100} Detective Stechschulte testified that Laws was a part of East Side and Manniworld while Omosikeji was part of North Side and MDB. Tr. 616. He indicated that Laws's death was the culmination of an "ongoing feud" between Laws and Omosikeji. Tr. 641. Smith, who was with Omosikeji at the time that Laws was shot, was also affiliated with North Side and MDB. Tr. 624, 686. Smith's brother was Romelo, who was an original member of MDB. Tr. 624-625. Detective Stechschulte testified that the Laws's shooting was a "big spark" that "inflamed" tensions between East Side and North Side gangs. Tr. 688.

{¶101} From his experience, Detective Stechschulte had come to know that Hezekiah was with the Manniworld and East Side; Allen was with South Side; and

Manley was with Manniworld and East Side. Tr. 643-644. He also said that Wilson's brother, Danarius Wilson ("Danarius"), was affiliated with Manniworld and East Side. Tr. 644. Danarius was apparently "best friends" with Laws and was a pallbearer at Laws's funeral. Tr. 645.

{¶102} The prosecutor asked whether Wilson was "associated with the East Side gang * * *[.]" Tr. 662. Detective Stechschulte affirmed that Wilson was East Side but testified that Wilson had more of a "hybrid" affiliation with gangs in in the Lima area, being associated with the South Side, East Side, and Outlaw gangs in the Lima area. Tr. 642, 662. The State introduced several videos and pictures of Wilson making hand gestures that are associated with the Manniworld gang. Tr. 632-633, 636, 638, 639, 735, 742. Ex. 103, 106, 107, 109, 113. In a number of these pictures, Wilson was alongside Allen. Tr. 639. Ex. 103, 106, 107, 109.

{¶103} Detective Stechschulte also testified that correctional institutions will often keep records of gang affiliations of inmates because members of rival gangs generally need to be separated from each other. Tr. 646. In addition to Danarius, Wilson, Hezekiah, Allen, Manley, and Laws, Detective Stechschulte testified about at least nine other individuals who were affiliated with East Side. Tr. 643, 645, 646, 648, 649, 650, 651, 653, 656, 658. *See* Tr. 665. He detailed a number of homicides, robberies, and shootings that different combinations of these nine individuals had committed in concert with each other at different times. Tr. 642-660. He stated that

these individuals had received felony convictions for the multiple offenses of violence that he listed in his testimony.  Tr. 663-664.

{¶104} Detective Stechschulte stated that his testimony regarding these individuals was based on his investigative experience and his personal knowledge.  Tr. 660, 663.  He further testified that "the majority of the shooting homicides that [he had] * * * dealt with are East Siders * * * committing those."  Tr. 662.  Detective Stechschulte stated that he knows that all of the offenses about which he testified happened after January 1, 1999 because he was not an investigator until 2007.  Tr. 664.  He also affirmed that "the latest of th[e]se offenses occurred within five years of a prior such offense" and that these "offenses occurred on at least two different occasions or by two or more members of the gang[.]"  Tr. 665.  Detective Stechschulte documented his findings in a report that was admitted into evidence.  Tr. 774.  Ex. 112.

{¶105} Further, Investigator Aaron Montgomery ("Investigator Montgomery"), who works for the Lima Police Department, testified about roughly forty individuals affiliated with East Side.  Tr. 512-524.  He listed the offenses that he had uncovered in the process of investigating each of these individuals.  Tr. 512-524.  These offenses included homicide, shootings, drug possession, and robberies.  Tr. 514, 515, 516, 517, 519, 520, 521.  Investigator Montgomery affirmed that he detailed "offenses of violence, felonies, and felony drug instances * * * [.]"  Tr. 524.

He also affirmed that the information relayed in his testimony came from his personal experience.  Tr. 524.

{¶106} During his interview with the police, Wilson admitted that he had been at Laws's funeral on June 21, 2019.  Ex. 102.  Tr. 711.  Maria testified that she was driving from Laws's funeral on Cole Street with Hezekiah, Wilson, Allen, and Manley.  Tr. 325.  In footage from security cameras located around Wally's, Maria's white car can be seen driving past the gas station and doing a U-turn to come back towards Wally's.  Ex. 22.  Detective Stechschulte stated the police interpreted this to mean that "some conversation occurred in that car prior to this * * *."  Tr. 694.  "They just didn't have a vision or a premonition that Romelo Blackman was sitting back there * * *.  They saw him when they drove past."  Tr. 694.

{¶107} Further, in this footage, Maria's car can be seen stopped on Cole Street while Hezekiah, Allen, and Wilson then got out of the car.  Ex. 22.  As Hezekiah, Allen, and Wilson walked together towards the carwash area, Maria pulled into Wally's parking lot.  Ex. 22.  Tr. 695.  Manley then got out of Maria's car; walked into the gas station; and then returned to Maria's car.  Ex. 22.  Detective Stechschulte noted that Manley did not flinch as he was walking back to Maria's car when the gunfire began.  Tr. 695.  For this reason, as he was investigating this incident, Detective Stechschulte believed that Manley "knew that those shots were going to be fired * * * and the only way he would know is if they talked about it before the car parked and let the three individuals out * * *."  Tr. 695.

{¶108} Detective Stechschulte also pointed to the fact that Romelo's testimony "that he didn't really have any beef, any problems with * * * Eric Wilson, Jr. at all up to this date [June 21, 2019]" as an indication that this incident on June 21, 2019 was retaliation by the East Side gang against the North Side gang for Laws's death. Tr. 687. He testified that he could uncover no other tensions or issues between Wilson and Romelo or between Wilson and Cartagena. Tr. 716. Further, the State introduced evidence that Wilson did not act alone in firing at Romelo. Wilson was one of three individuals who got out of Maria's car. Ex. 22. Kamler saw two individuals firing guns from the carwash area. Tr. 218. Mayer testified that Hezekiah was standing with one or two others when the shots were fired. Tr. 206. Kramer determined that, of the nineteen shell casings found at Wally's, eleven came from one gun, and eight came from another gun. Ex. 97. Tr. 585.

{¶109} Finally, felonious assault in violation of R.C. 2903.11 and discharging a firearm at or into a habitation in violation of R.C. 2923.161 are listed as "[o]ffense[s] of violence" in R.C. 2901.01. R.C. 2901.01. *See* Tr. 865. *See* R.C. 2923.41(B)(1)(b), (C). Additionally, Wilson was convicted of improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16. *See* R.C. 2923.41(B)(1)(c), (C). He was also convicted of three other felony offenses that do not include the convictions he received for offenses of violence, the offense of improperly handling a firearm in a motor vehicle, or the offense of participating in a criminal gang. Doc. 4. Tr. 865. *See* R.C. 2923.41(B)(1)(a), (C). We previously

found these other convictions to be supported by sufficient evidence and not against the manifest weight of the evidence in our analysis of this assignment of error. Thus, having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence from which a reasonable trier of fact could determine that Wilson was guilty of participating in a criminal gang.

{¶110} As to the manifest weight of the evidence, we again reincorporate the evidence that we considered in the manifest weight analysis conducted under the first count of felonious assault. Having examined the materials presented at trial, we conclude that the conviction on this charge is not against the manifest weight of the evidence.

{¶111} *Firearm Specifications*: To establish a firearm specification under R.C. 2941.145(A), the State must prove that the defendant "[1] had a firearm on or about [his] * * * person or under the offender's control while committing the offense [2] and displayed the firearm, brandished the firearm * * *, or used it to facilitate the offense." R.C. 2941.145(A). *See* Tr. 882. In this case, there were firearm specifications for both counts of felonious assault; the count of discharging a firearm on or near prohibited premises; the count of discharging a firearm at or into a habitation; and the count of participating in a criminal gang. Doc. 4.

{¶112} As to the sufficiency of the evidence, Wall testified that, on June 21, 2019, she saw Wilson fire a gun from near the third bay of the carwash next to Wally's. Tr. 232, 238. Wall also testified that Wilson pointed the firearm directly

at her; that he was waving the firearm; and that he had been shooting wildly. Tr. 232, 236, 237. Further, Maria also testified that she saw Wilson firing a gun at Wally's, though she stated that she could not recall whether he was at one of the bays at the carwash. Tr. 329-330. Eleven shell casings found in the area around the third bay of the carwash. Tr. 431, 438. Ex. 31. These casings link the weapon that Wall saw Wilson firing to the offenses that carried firearm specifications.

{¶113} As to the two charges of felonious assault, Cartagena and Romelo heard multiple gunshots being fired at them as they pulled out of Wally's. Tr. 282, 288, 405, 406. The police also discovered multiple bullet holes in the pickup Cartagena was driving. Tr. 382, 463-464. Ex. 19-21, 82-86. The State introduced evidence that a bullet had been recovered from Romelo's headrest in Cartagena's pickup truck. Tr. 382, 465. Ex. 87. Kramer testified that he determined that this bullet had been fired by the same gun from which the eleven shell casings found at the third bay of the carwash had originated. Tr. 585. Ex. 97.

{¶114} As to the charge of discharging a firearm on or near prohibited premises, Officer Carman testified that he took pictures of several bullet holes in two cars that were located in a driveway across the street from Wally's. Tr. 454. Ex. 76-78. He also saw several trees on the other side of the street that had bullet holes in them. Tr. 453, 455. Ex. 79-80. Custer testified that his house had been struck by gunfire and that he lived on the other side of Cole Street from Wally's.

Tr. 248. Ex. 11-17. Further, Cartagena and Romelo testified that their pickup truck was being fired at while they were on the roadway. Tr. 282, 288, 405, 406.

{¶115} As to the charge of discharging a firearm at or into a habitation, Custer testified that his house had been hit by gunfire at the time of the shooting on June 21, 2019. Tr. 248. Kramer determined that a bullet removed from Custer's house was fired from the same gun from which the eleven shell casings found around the third bay of the carwash had originated. Tr. 585. Ex. 97.

{¶116} As to the charge of participating in a criminal gang, the criminal conduct, as defined by R.C. 2923.41(C), that Wilson undertook to further the interests of the East Side gang was composed of felonies, offenses of violence, and a violation of R.C. 2923.16 that each involved the use of a firearm. Tr. 232, 237-238, 276, 288 331, 405-406, 585-587. Ex. 22. Doc. 4. *See* Tr. 714-716. *See* R.C. 2923.41(C). Thus, having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence to support the five firearm specifications in this case.

{¶117} As to the manifest weight of the evidence for these five firearm specifications, we again reincorporate the manifest weight analysis conducted under the first count of felonious assault. Having examined the materials presented at trial, we conclude that the convictions for the five firearms specifications are not against the manifest weight of the evidence.

{¶118} *Criminal Gang Activity Specifications*: To establish a criminal gang activity specification under R.C. 2941.142(A), the State must prove that the defendant "[1] committed the felony that is an offense of violence [2] while participating in a criminal gang." R.C. 2941.142(A). *See* Tr. 885. In this case, there were three criminal gang activity specifications for both counts of felonious assault and for the count of improperly discharging a firearm into a habitation. Doc. 4. R.C. 2901.01 classifies felonious assault in violation of R.C. 2903.11 and improperly discharging a firearm into a habitation in violation of R.C. 2923.161 as "[o]ffense[s] of violence." R.C. 2901.01. *See* Doc. 4.

{¶119} We turn now to examining whether the State established that these felony offenses of violence were committed "while participating in a criminal gang." R.C. 2941.142(A). In this case, Detective Basinger testified that Omosikeji admitted to shooting and killing Laws on June 14, 2019. Tr. 197. Detective Stechschulte testified that Omosikeji was affiliated with North Side; that Laws was affiliated with East Side; and that Laws's death inflamed tensions between these two gangs. Tr. 616, 679, 688, 691. Patrolman Crish testified that he anticipated retaliation after hearing of Laws's death. Tr. 361.

{¶120} Detective Stechschulte testified that Smith, who was with Omosikeji at the time that Laws was shot, was Romelo's brother. Tr. 625. He further testified that Smith and Romelo were affiliated with MDB and North Side. Tr. 625, 686-687. Hezekiah, Allen, Manley, and Wilson were affiliated with East Side and

attended Laws's funeral just before the shooting on June 21, 2019. Tr. 323-324, 362, 364, 390, 617, 618, 623, 624-625, 643-644, 679, 686.

{¶121} The State introduced video footage from the security cameras around Wally's. Ex. 22. In this footage, Maria can be seen doing a U-turn on Cole Street to head back towards Wally's; letting Hezekiah, Allen, and Wilson out of her vehicle together; and then pulling into Wally's parking lot. Ex. 22. Hezekiah, Allen, and Wilson then headed towards the area around the carwash. Ex. 22. Shortly after Cartagena pulled his pickup out of Wally's parking lot and onto Cole Street, his vehicle was struck by gunfire. Tr. 405, 406.

{¶122} Kamler's testimony that he saw two shooters present at Wally's. Tr. 218. Wall and Maria testified that they observed Wilson firing a gun next to the carwash. Tr. 232, 237-238, 331. Thus, Wilson was one of two people firing at Cartagena's pickup truck. Further, the police recovered shell casings that were fired by two different guns and in two different areas next to the carwash. Tr. 431-432, 585. Ex. 97. This testimony indicates that Wilson acted in concert with other members of East Side on June 21, 2019.

{¶123} Detective Stechschulte testified that Romelo "was obviously the target" of this shooting. Tr. 715. However, Romelo testified that he had never had any issues with Wilson prior to June 21, 2019. Tr. 411. Detective Stechschulte stated that he could not uncover any tensions between Romelo and Wilson. Tr. 716. He testified that Wilson's involvement in this shooting made sense in the context of

"the Christian Laws homicide, back to North Side/East Side." Tr. 715. These facts are what led Detective Stechschulte to a conclusion as to whether the June 21, 2019 shooting * * * furthered the interest of the East Side gang[.]" Tr. 714. This information provides sufficient evidence to support the conclusion that Wilson was participating in criminal gang activity when he repeatedly discharged a firearm next to the carwash on June 21, 2019.

{¶124} In concert with Wall's testimony and the results from Kramer's tests, the bullet lodged in Custer's house connects Wilson's participation in the criminal gang activity to his conviction for improperly discharging a firearm into a habitation in violation of R.C. 2923.161. Tr. 232, 236, 237-238, 585. Ex. 97. Similarly, in connection with Wall's testimony and the results from Kramer's tests, the bullet recovered from the headrest in Cartagena's pickup truck links Wilson's participation in the criminal gang activity to his convictions for felonious assault. Tr. 232, 236, 237-238, 585. Ex. 97. Having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence for the three criminal gang activity specifications in this case.

{¶125} As to the manifest weight of the evidence for these three criminal gang activity specifications, we again reincorporate the manifest weight analysis conducted under the first count of felonious assault. Having examined the materials presented at trial, we conclude that the convictions for the three criminal gang activity specifications are not against the manifest weight of the evidence.

{¶126} *Specification for Forfeiture of a Weapon*: To establish a specification concerning forfeiture of a firearm under R.C. 2941.1417(A), the State must prove that the defendant "[1] was the owner and/or possessor of a handgun" that "[2] was an instrumentality that the defendant used or intended to use in the commission or facilitation of the offense * * *." Tr. 891. *See* R.C. 2941.1417(A). In this case, this specification accompanied the charge of carrying a concealed weapon. Doc. 4.

{¶127} In this case, Maria and Wall testified that Wilson was firing a gun next to the carwash at Wally's on June 21, 2019. Tr. 237-238, 331. Wall indicated that Wilson was standing next to the third bay of the carwash when he was firing his gun. Tr. 232. Kramer testified that the eleven shell casings found by the third bay of the carwash were fired by the gun that is subject to this forfeiture is specification. Tr. 585. Ex. 97. Having reviewed the evidence presented at trial, we conclude that the State presented sufficient evidence for this forfeiture of a weapon specification.

{¶128} As to the manifest weight of the evidence for this forfeiture specification, we again reincorporate the manifest weight analysis conducted under the first count of felonious assault. Having examined the materials presented at trial, we conclude that the conviction on this forfeiture specification is not against the manifest weight of the evidence.

{¶129} In conclusion, having examined each of Wilson's convictions, we conclude that the State satisfied its burden of production by providing some

evidence for each of essential elements for the crimes charged. Further, the State met its burden of persuasion as a review of the record makes clear that these convictions were not against the manifest weight of the evidence. For these reasons, Wilson's first and second assignments of error are overruled.

*Third Assignment of Error*

{¶130} Wilson asserts that he was denied his right to the effective assistance of counsel. He argues that defense counsel failed to call an expert witness and alleges that defense counsel had a conflict of interest.

Legal Standard

{¶131} "Under Ohio law, 'a properly licensed attorney is presumed to carry out his duties in a competent manner.'" *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 57, quoting *State v. Gee*, 3d Dist. Putnam No. 12-92-9, 1993 WL 270995 (July 22, 1993). "For this reason, the appellant has the burden of proving that he or she was denied the right to the effective assistance of counsel." *State v. Cartlidge*, 3d Dist. Seneca No. 13-19-44, 2020-Ohio-3615, ¶ 39. "In order to prove an ineffective assistance of counsel claim, the appellant must carry the burden of establishing (1) that his or her counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant." *State v. McWay*, 3d Dist. Allen No. 1-17-14, 2018-Ohio-3618, ¶ 24, quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶132} In order to establish deficient performance, the appellant must demonstrate that trial "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Howton*, *supra*, ¶ 35, quoting Strickland at 687, 466 U.S. 668, 687, 104 S.Ct. 2052. "[D]ebatable trial tactics do not establish ineffective assistance of counsel." *State v. Queen*, 3d Dist. Logan No. 8-19-41, 2020-Ohio-618, ¶ 14, quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 101.

{¶133} "In order to establish prejudice, 'the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.'" *State v. Berry*, 3d Dist. Union No. 14-20-05, 2021-Ohio-1132, ¶ 122, quoting *State v. Bibbs*, 2016-Ohio-8396, 78 N.E.3d 343, ¶ 13 (3d Dist.). If the appellant does not establish one of these two prongs, the appellate court does not need to consider the facts of the case under the other prong of the test. *State v. Baker*, 3d Dist. Allen No. 1-17-61, 2018-Ohio-3431, ¶ 19, citing *State v. Walker*, 2016-Ohio-3499, 66 N.E.3d 349, ¶ 20 (3d Dist.).

Legal Analysis

{¶134} Wilson raises two main arguments to establish that his trial counsel was ineffective. First, he argues that defense counsel was ineffective for failing to call an expert witness. As an initial matter, we note that "[a] decision by trial counsel not to call an expert witness generally will not sustain a claim of ineffective

assistance of counsel." *State v. Conaway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 118.

> **In fact, in many criminal cases trial counsel's decision not to seek expert testimony 'is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.' *State v. Glover*, [12th Dist.] Clermont App. No. CA2001-12-102, 2002-Ohio-6392, 2002 WL 31647905, at ¶ 95. "Further, even if the wisdom of such an approach is debatable, 'debatable trial tactics' do not constitute ineffective assistance of counsel." *Id*., quoting *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 402 N.E.2d 1189.**

*Costell, supra*, at ¶ 32, quoting *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, 787 N.E.2d 691 (10th Dist.). Trial counsel's "decision to rely on [the] * * * cross-examination" of the State's expert witnesses "should be viewed as a legitimate 'tactical decision.'" *State v. Hartman*, 93 Ohio St.3d 274, 299, 2001-Ohio-1580, 754 N.E.2d 1150, 1177 (2001).

{¶135} On appeal, Wilson merely asserts that his trial counsel's decision not to call an expert witness constituted deficient performance. This does not establish the first prong of an ineffective assistance of counsel claim. Further, Wilson does not explain how calling an expert witness would have changed the outcome of his trial. He merely alleges that the testimony of an expert witness for the Defense "would have been able to rebut the state's testimony * * *." Appellant's Brief, 7. However, he offers no evidence in support of this contention, rendering this argument speculative. *Hartman* at 299 (finding that evidence of what an expert

would have testified about would usually be established by materials outside of the record, generally placing such a challenge outside of the scope of a direct appeal).

**{¶136}** Second, Wilson alleges that defense counsel previously represented Omosikeji when he was prosecuted for his involvement in the shooting death of Laws ("the Laws case"). He then argues that this prior representation created a conflict of interest that deprived him of his right to the effective assistance of counsel. "A criminal defendant's Sixth Amendment right to the effective assistance of counsel encompasses both the right to competent representation and the right to representation that is free from conflicts of interest." *State v. Barrow*, 2018-Ohio-1703, 111 N.E.3d 714, ¶ 36 (1st Dist.).

**{¶137}** A "conflict of interest" refers to a "circumstance[] in which regard for one duty tends to lead to disregard of another duty * * *." *State v. Hathaway*, 2015-Ohio-5488, 55 N.E.3d 634, ¶ 14 (2d Dist.).

> **A *possible* conflict of interest exists where the 'interests of the defendants *may* diverge at some point so as to place the attorney under inconsistent duties.' (Emphasis added.)** *State v. Dillon* **(1995), 74 Ohio St.3d 166, 168, 657 N.E.2d 273, 275-276, quoting** *Cuyler[ v. Sullivan]*, **446 U.S. [355,] 356, 100 S.Ct. [1708,] 1722, 64 L.Ed.2d [333,] 351-352, fn. 3. It follows, then, that an *actual* conflict of interest exists if, 'during the course of the representation, the defendants' interests *do* diverge with respect to a material factual or legal issue or to a course of action.' (Emphasis added.)** *Id*. **at 169, 657 N.E.2d at 276, quoting** *Cuyler*, **446 U.S. at 356, 100 S.Ct. at 1722, 64 L.Ed.2d at 351–352, fn. 3; see, also,** *Winkler[ v. Keane]*, **7 F.3d [304,] 307 [(C.A.2 1993)]. Indeed, we have said that a lawyer represents conflicting interests 'when, on behalf of one client, it is his duty to contend for that**

> **which duty to another client requires him to oppose.' [*State v.*]**
> ***Manross*, 40 Ohio St.3d [180,] 182, 532 N.E.2d [735,] 738 [(1988)].**

(Emphasis sic.)  *State v. Gillard*, 78 Ohio St.3d 548, 1997-Ohio-183, 679 N.E.2d

276 (1997).

> **A defendant who claims he was denied the right to conflict-free**
> **counsel must demonstrate that 'an actual conflict of interest'**
> **adversely affected his lawyer's performance.  *Wood [v. Georgia*,**
> **450 U.S. 261,] 273, 101 S.Ct. 1097[, 457 L.Ed.2d 220 (1981)]; *Moss***
> **[*v. United States*, 323 F.3d 445,] 459-460 [(6th Cir. 2003)].  'A**
> **possible conflict is insufficient.'  *State v. Getsy*, 84 Ohio St.3d 180,**
> **187, 702 N.E.2d 866 (1998).**

*Barrow* at ¶ 37.  *See Manross* at 182.  Thus, "a defendant must show that his interests

diverge with respect to a material factual or legal issue or to a course of action with

the other represented party in order to show an actual conflict." *State v. McDonald*,

4th Dist. Lawrence No. 09CA4, 2009-Ohio-5132, ¶ 16.

> **Conflicts may arise when an attorney simultaneously represents**
> **clients with different interests (multiple [or simultaneous]**
> **representation), or when an attorney representing a defendant**
> **has previously represented codefendants or trial witnesses**
> **(successive representation).**

*State v. Buck*, 2017-Ohio-8242, 100 N.E.3d 118, ¶ 91 (1st Dist.), quoting *Moss* at

459.  "Simultaneous and successive representation differs materially because in the

latter, the attorney is no longer beholden to the former client." *State v. Jones*, 5th

Dist. Stark Nos. 2007-CA-00041, 2007-CA-00077, 2008-Ohio-1068, ¶ 77.  For this

reason, "[i]t is more difficult for a defendant to show that counsel actively

represented conflicting interests in cases of successive rather than simultaneous representation." *Moss* at 459.

**{¶138}** The record does not contain any information that establishes that defense counsel represented Omosikeji in the Laws case. However, even assuming that defense counsel was involved in this prior representation, Wilson has not established an ineffective assistance of counsel claim because his arguments do not demonstrate that an actual conflict of interest existed in this case.[5] Wilson has not explained how his interests diverged from or were adverse to Omosikeji's interests on any factual or legal issue. Further, the evidence in the record contains no indication that defense counsel's prior representation of Omosikeji in the Laws case and his representation of Wilson would have involved any conflicting duties.

**{¶139}** Further, in cases involving successive representation, the prior clients that are typically the basis of an alleged conflict of interest are "codefendants or trial witnesses * * *." *Buck, supra*, at ¶ 91, quoting *Moss, supra,* at 459. In this case, Omosikeji was neither one of Wilson's codefendants nor a witness in Wilson's trial. But in his brief, Wilson argues that defense counsel should have called Omosikeji as a witness and then suggests that Omosikeji was not called because of this alleged conflict of interest. Appellant's Brief, 8.

---

[5] In its brief, the State admits that defense counsel had previously represented Omosikeji in the Laws case. Appellee's Brief, 16.

{¶140} However, there is no indication that Omosikeji would have had any relevant testimony to offer in Wilson's case. In the absence of any evidence that would substantiate the allegation that there was an actual conflict of interest, this argument is ultimately a claim that defense counsel was ineffective for failing to call Omosikeji as a witness at trial with some added speculation as to why defense counsel did not call him. A trial counsel's decision not to call a witness lies within the realm of debatable trial tactics and does not, therefore, generally provide a basis for an ineffective assistance of counsel claim. *State v. Risner*, 3d Dist. Wyandot No. 16-20-05, 2021-Ohio-342, ¶ 28. Thus, Wilson has not established that an actual conflict of interest existed in this case or that defense counsel's performance was deficient. Accordingly, this argument is without merit.

{¶141} In this assignment of error, Wilson concludes by arguing that the cumulative effect of his trial counsel's errors at trial was significant enough to deny him his right to the effective assistance of counsel. However, Wilson has not demonstrated that his trial counsel committed any errors that constituted deficient performance or that affected the outcome of his trial. As such, this argument is without merit. Since Wilson has not carried the burden of establishing an ineffective assistance of counsel claim, his third assignment of error is overruled.

*Seventh Assignment of Error*

{¶142} Wilson asserts two main arguments. First, he asserts that the trial court failed to consider the sentencing factors in R.C. 2929.11 and R.C. 2929.12.

Second, he also argues that the trial court erred in imposing his sentences consecutively. We will consider these arguments in separate analyses.

Legal Standard for Sentencing Factors

**{¶143}** In rendering a sentence, "[t]he trial court has full discretion to impose any sentence within the authorized statutory range * * *." *State v. Dayton*, 3d Dist. Union No. 14-16-05, 2016-Ohio-7178, ¶ 15, quoting *State v. King*, 2013-Ohio-2021, 992 N.E.2d 491, ¶ 45 (2d Dist.). However, in this process, trial courts are to sentence convicted felons in accordance with the overriding purposes of felony sentencing, which

> **are to protect the public from future crime by the offender and others, to punish the offender, and to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources. To achieve those purposes, the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both.**

R.C. 2929.11. "To effectuate compliance with these overriding purposes, the Ohio Revised Code requires the trial court to consider a number of factors listed in R.C. 2929.12." *State v. Walton*, 3d Dist. Logan No. 8-17-55, 2018-Ohio-1680, ¶ 6. "The R.C. 2929.12 factors direct the trial court to evaluate the seriousness of the offense and the likelihood of recidivism." *Berry*, *supra*, at ¶ 137, citing R.C. 2929.12.

**{¶144}** If the defendant establishes by clear and convincing evidence that his or her sentence is "(1) contrary to law and/or (2) unsupported by the record," an

appellate court has the authority, pursuant to R.C. 2953.08(G)(2), "to increase, reduce, or otherwise modify a sentence * * *." *State v. McGowan*, 147 Ohio St.3d 166, 2016-Ohio-2971, 62 N.E.3d 178, ¶ 1. However, following the Ohio Supreme Court's holding in *State v. Jones*,

> **R.C. 2953.08(G)(2)(b) 'does not provide a basis for an appellate court to modify or vacate a sentence based on its view that the sentence is not supported by the record under R.C. 2929.11 and 2929.12.' * * * [*State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, 169 N.E.3d 649,] ¶ 39. * * * R.C. 2953.08(G)(2)(a) permits an appellate court to modify or vacate a sentence if the appellate court clearly and convincingly finds that the record does not support the sentencing court's findings under certain specified statutory provisions. *Id.* at ¶ 28. However, R.C. 2929.11 and 2929.12 are not among the statutory provisions listed in R.C. 2953.08(G)(2)(a). *Id.* Instead, only 'R.C. 2929.13(B) and (D), 2929.14(B)(2)(e) and (C)(4), and 2929.20(I) are specified' in R.C. 2953.08(G)(2)(a). *Id.* Furthermore, the court explained that 'an appellate court's determination that the record does not support a sentence does not equate to a determination that the sentence is 'otherwise contrary to law' as that term is used in R.C. 2953.08(G)(2)(b).' *Id.* at ¶ 32.**

*State v. Slife*, 3d Dist. Auglaize No. 2-20-17, 2021-Ohio-644, ¶ 13. "Thus, * * * an appellate court may not modify or vacate a felony sentence based upon a finding by clear and convincing evidence that the record does not support the trial court's 'findings' under R.C. 2929.11 and R.C. 2929.12." *State v. Foster*, 3d Dist. Union No. 14-20-26, 2021-Ohio-1454, ¶ 31.

### Legal Analysis for Sentencing Factors

{¶145} Wilson argues that the trial court failed to "consider all of the relevant factors" in R.C. 2929.11 and R.C. 2929.12. Appellant's Brief, 17. *See Slife* at ¶ 8.

However, in its judgment entry, the trial court expressly stated that it had considered the principles and purposes of felony sentencing as set forth in R.C. 2929.11. Doc. 360. *See* Tr. 953. Further, at the sentencing hearing, the trial court stated that it had considered a presentence investigation report for Wilson from a 2015 offense. Tr. 951. The trial court asked the State if Wilson had any convictions since that 2015 offense. Tr. 951. The trial court then conducted an extensive discussion of the statutory factors listed in R.C. 2929.12. Tr. 956-964. Finally, in its judgment entry, the trial court listed each of the factors from R.C. 2929.12 that it had found to be applicable in the case. Doc. 360.

{¶146} The materials in the record clearly establish that the trial court considered the purposes and principles of felony sentencing in R.C. 2929.11 in addition to the relevant statutory factors listed in R.C. 2929.12 before it imposed Wilson's sentence in this case. Tr. 952. Doc. 360. Further, Wilson has not demonstrated that his sentence is clearly and convincingly contrary to law or identified, in his brief, a basis upon which this Court could vacate or modify his sentence. For this reason, the first argument under this assignment of error is without merit.

Legal Standard for Consecutive Sentences

{¶147} R.C. 2929.14(C)(4) governs the imposition of consecutive sentences. R.C. 2929.14(C)(4). This provision reads, in its relevant part, as follows:

**(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:**

**(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.**

**(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.**

**(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.**

R.C. 2929.14(C)(4). The trial court needs only to find that one of the three factors listed in R.C. 2929.14(C)(4)(a-c) is applicable. *State v. Robinson*, 3d Dist. Hancock No. 5-16-13, 2017-Ohio-2703, ¶ 12.

**{¶148}** "[T]he record must contain a basis upon which a reviewing court can determine that the trial court made the findings required by R.C. 2929.14(C)(4) before it imposed consecutive sentences." *State v. Rodriguez*, 3d Dist. Hancock Nos. 5-19-40 and 5-19-41, 2020-Ohio-2987, ¶ 6, quoting *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 28. However, "no statute directs a

sentencing court to give or state reasons supporting imposition of consecutive sentences." *Bonnell* at ¶ 27.

**{¶149}** "Under R.C. 2953.08(G)(2), an appellate court will reverse a sentence 'only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law.'" *State v. Nienberg*, 3d Dist. Putnam Nos. 12-16-15 and 12-16-16, 2017-Ohio-2920, ¶ 8, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 1.

> **Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.**

*State v. Taflinger*, 3d Dist. Logan No. 8-17-20, 2018-Ohio-456, ¶ 12, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus (1954).

Legal Analysis for Consecutive Sentences

**{¶150}** At Wilson's sentencing hearing, the trial court made the following statements with regard to the imposition of consecutive sentences:

> **The Court is going to find that consecutive service is necessary, pursuant to 2929.14(C)(4) because the Court finds that consecutive service is necessary to protect the public from future crime.**

**I don't know that I've had a case before me that is more deserving of protecting the public from future crime, as well as to punish the offender.**

**The Court further finds that consecutive service is not disproportionate to the seriousness of his conduct and particularly to the danger he poses to the public.**

**The Court also finds that at least two of the multiple offenses [were] committed as part of one or more courses of conduct and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the defendant's conduct.**

**And I would also note when we talk about harm, while Romelo Blackman and Jayden Cartagena were specifically referenced as victims, Paul Custer is a victim, Cynthia Wall is a victim. Any one that was in that area and had to duck or left with the trauma of those events was harmed by what this defendant and his cohorts decided to do.**

**Further, the Court would find that the defendant's history of criminal conduct, particularly the weapons cases and his juvenile adjudications, demonstrate that consecutive sentences are necessary to protect the public from future crime by the offender.**

Tr. 967-969. Further, the trial court not only made these required findings at the sentencing hearing but also reiterated them in writing in its judgment entry of sentencing. Doc. 360.

{¶151} Prior to making these required findings, the trial court conducted an extensive examination of the facts of this case. Tr. 956-964. During this examination, the trial court noted, when the shooting occurred at Wally's, "there were just an incredible amount of people" in the vicinity, including a bus with forty-

-68-

eight children on board, "and any one of them * * * with 19 shots could have been killed. And the people firing those shots didn't care one bit." Tr. 962. The trial court also noted that, when Wilson and his associates

> **were in attendance at Christian Laws' funeral that [they] had guns on them [and] were prepared if they saw anybody they thought might be remotely tied to the death of Christian Laws [and] they were going to get their pound of flesh.**

Tr. 958. The trial court considered the evidence regarding Wilson's connections to local gangs and found that Wilson's acts had been "committed as part of an organized criminal activity." Tr. 957, 961. The trial court also discussed the harm to the victims of this case; Wilson's lack of remorse; and Wilson's failure to respond favorably to criminal sanctions in his past. Tr. 956-957, 959.

{¶152} Having reviewed the evidence in the record, we conclude that the trial court made the findings required by R.C. 2929.14(C)(4) and conducted an extensive analysis of various facts from this case that were relevant to these findings. *See also State v. Morgan*, 3d Dist. Marion No. 9-21-11, 2021-Ohio-3972, ¶ 7. Wilson has not, with these arguments, demonstrated that the imposition of consecutive sentences in this case was clearly and convincingly contrary to law. Thus, Wilson's second argument under this assignment of error is without merit. Accordingly, his seventh assignment of error is overruled.

*Conclusion*

**{¶153}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Allen County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and SHAW, J., concur.**

**/hls**